# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00608-CR

**Carlos Molina, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. D-1-DC-07-204572, HONORABLE FRED A. MOORE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Carlos Molina was convicted by a jury of murder. *See* Tex. Penal Code Ann. § 19.02 (West 2003). The jury assessed punishment at twenty-seven years' confinement in the institutional division of the Texas Department of Criminal Justice. In a single point of error, appellant complains that the trial court abused its discretion by denying appellant's request to reopen the evidence. We will affirm the judgment of conviction.

## BACKGROUND

The jury heard evidence that on August 4, 2007, appellant stabbed his neighbor Daniel Delira to death. It was undisputed that appellant killed Delira. Appellant focused his strategy on defense-of-self and defense-of-third-person theories.

Efrain Jasso, a friend of Delira's, testified that he was fixing one of Delira's cars in his apartment complex on the day of the murder. Jasso stated that he saw Delira and appellant

talking and then fighting. The two fought for approximately five to eight minutes. Jasso testified that he intervened and broke up the fight. Jasso helped Delira to his feet, and appellant left. Jasso testified that he and Delira were walking toward where Jasso was fixing the car when they heard a yell from up above. He stated that he saw appellant coming back with a kitchen knife. Appellant pursued Delira as he ran into a nearby apartment.[1] Jasso stated that Delira attempted to close the apartment's door so appellant "would not hit him with the knife." Delira ultimately let the door go or was unable to hold it, and both he and appellant ended up inside the apartment. Jasso testified that Delira tried to get ahold of the knife. Appellant then stabbed Delira. Jasso tried to put a blanket in between them so that appellant would stop stabbing Delira. Jasso helped Delira up and they walked out of the apartment. Jasso helped Delira try to get to his apartment. Delira stopped in the breezeway of the apartment complex. Jasso stated that he tried to signal a police helicopter that was overhead and tried to call 911. Jasso further testified that he was with Delira when he died.

Antonio Chapparo-Carreno testified next for the State. Chapparo lived in apartment 141 with his brother, his mother, and three friends. He testified that he was sitting on his bed watching television when he heard yelling, and then Delira rushed into his apartment. When asked what Delira was doing when he entered his apartment, Chapparo responded, "I imagine he was trying to protect himself. He was trying to close the door." Chapparo testified that appellant was trying to push his way in. When he saw appellant trying to stab Delira, Chapparo fled the apartment.

---

[1] Delira ran into apartment 141. Appellant lived in apartment 144. The two apartments were adjacent to one another.

Elifas Cruz-Massariegos testified that he had lived in appellant's apartment for two days before the murder. Cruz testified that he arrived at the apartment complex that day about four o'clock. He noticed that appellant was drunk. Cruz drank two beers that appellant offered him and then went to take a nap because it was a very hot day. Cruz got up around five o'clock and started fixing himself something to eat. He testified that appellant went outside the apartment and that shortly thereafter he noticed a lot of talking coming from outside. Cruz stated that he opened the door and saw appellant and Delira fighting. Cruz testified that they were both hitting each other. According to Cruz, appellant eventually came back into his apartment and closed the door. Appellant then picked up a knife from the kitchen and ran back outside. Cruz testified that appellant's wife attempted to stop him. She attempted to take the knife away from him, but was overpowered by appellant. Cruz did not see Delira using a weapon.

Officer Ryan Miller, a tactical flight officer with the Austin Police Department, described the crime scene. He responded to the scene less than a minute after being dispatched. Miller also identified an aerial video of the crime scene.

Sergeant James Watzke with the Austin Police Department responded to the scene as well. He met with the first unit at the scene, Lieutenant Ockletree. Watzke saw EMS personnel attending to a man lying on the ground. Ockletree informed Watzke that other residents of the complex said the person who had stabbed Delira was in apartment 144. After some time, appellant was apprehended and placed in custody. According to Watzke, when the crowd of people that had gathered saw appellant, they shouted, "That's him, that's him."

3

Dr. David Dolinak, the Travis County Chief Medical Examiner who performed the autopsy on Delira, testified that Delira suffered multiple wounds on his body. A stab wound in Delira's right shoulder penetrated the muscle in the side of his neck and went through a vein in the side of his neck. According to Dolinak, this wound would not necessarily have been fatal. The mortal stab wound went through Delira's ribs on the right side. It was six inches deep and made a one-inch cut to the back side of Delira's heart. The cut caused bleeding which filled the pericardial sac around the heart. Dolinak testified that bleeding into the pericardial sac causes pressure around the heart "until it gets so compressed by the blood around it that it can't function and pump blood anymore." In this way, the bleeding into the pericardial sac eventually caused Delira's heart to stop. Dolinak also testified that Delira suffered defensive wounds to his left hand and left arm during the attack. On cross-examination Dolinak acknowledged that all of the wounds could have been caused by Delira lunging at appellant. Dolinak also noted that Delira had an ethanol level of .17, a vitreous alcohol level of .21, and a small amount of cocaine in his system.

Appellant called Angel Mireles, a neighbor who lived directly above appellant's apartment. He observed appellant and Delira fighting, and he saw Delira push appellant's wife against a wall. Mireles testified that he heard Delira threaten to kill appellant. According to Mireles, Delira had been "threatening a lot of people with a gun that he had." Mireles testified that he did not see the stabbing.

Appellant also testified. He stated that he and Delira had a previous encounter three weeks to a month earlier. Appellant testified that Delira was angry with him because he had called the police on him. Appellant called the police because he thought Delira had broken his window.

4

Appellant stated that Delira had told him he was going to kill him. He stated that Delira was "crazy" and "was always drugged out and he was always drunk and he wanted to kill me with a shotgun." Appellant further testified that on the day of the murder, he had been threatened by Delira. He stated that when he left his apartment to go to his car, Delira came at him and started hitting him. Appellant testified that when his wife came to help him, Delira punched her. According to appellant, while his wife was defending him, he went inside the apartment and Delira followed. Appellant stated that he was scared, so he grabbed a knife. Appellant testified that Delira was going to kill him, and that he was afraid Delira would hurt his wife and child, so he stabbed Delira. His wife then pushed appellant and Delira out the door. Appellant testified, "I was trying to defend myself, so I was going towards the apartment. I was getting closer to the other apartment." He further stated, "when I stabbed him, he was trying to take the knife from me."

The record indicates that appellant gave two statements to law enforcement officers on the day of the killing. The first statement, which was not offered until appellant's motion to reopen the evidence, was taken at the hospital following appellant's arrest. The second statement, which the State used to impeach appellant, was taken in an Austin Police Department interview room.

The second statement concerned whether or not appellant was drunk the night of the killing. Appellant stated that he had drunk at least ten beers, but was not drunk because he had eaten before drinking.[2] Appellant testified, "I wasn't drunk. I do say that I was a little drunk, but I wasn't

---

[2] Appellant also testified that he was drinking Bud Light, which in his estimation is not a strong beer.

drunk." The State continued to impeach appellant with his statements to police officers, specifically, "So she [appellant's wife] said to me, she said, 'You know what, leave him alone.' But when someone is drunk, it's like you are a kid and don't obey," and "Because I was so hotheaded, that's when I hit him."

On redirect, appellant testified that he did not intend to stab Delira in the heart. Appellant testified that he stabbed Delira "[o]nly to defend myself out of fright, that's all."

The State called Tomas Leon, who translated from Spanish to English the second statement appellant gave to Detectives Rodriguez and Guajardo. The State introduced the translated transcription of the interview into evidence, and the defense offered the original video of the interview.

The State next called Austin Police Department Detective Richard Guajardo. He questioned appellant in Spanish following the arrest both at the hospital and in an interrogation room. Guajardo testified concerning the second statement. According to Guajardo, appellant never indicated during the interview that anyone assaulted his wife. He further testified that he visited with appellant's wife on the day of the killing and observed no injuries. Guajardo stated that appellant used the excuse that he was drunk on many occasions during the interview. Both parties closed after Guajardo's testimony.

In the first statement, which was taken at the hospital, appellant talked to Guajardo about the killing. Appellant mentioned that Delira had made a death threat against him in the past. He noted that he had called the police on Delira before because he suspected him of breaking his window. He also made the statements that Delira had "pushed my wife," and that "he [Delira] is

6

bothering my family." He did not make any comments that established that Delira pushed his wife inside the apartment, or that he initially stabbed Delira inside the apartment. Appellant made several comments throughout the interview to the effect that he did not really know what happened.

The objection giving rise to this appeal occurred during the State's closing argument. The attorney for the State told the jury,

> An angry drunk lost the fight and he killed somebody. . . . There is nothing—he gave that statement right after this occurred. . . . But there is nothing about the victim going into the defendant's home. No mention of that whatsoever. And that's a statement that he gave right after it happened. There was nothing at all in that statement about Daniel Delira—there is nothing about Daniel Delira going into the home or Daniel Delira assaulting the defendant's wife. There is nothing about that in that statement.

Appellant's counsel asked to approach the bench, where the following exchange occurred:

> DEFENSE COUNSEL: Your Honor, I believe that the prosecutor is giving an improper impression on the jury and I am going to ask the Court to open the evidence again and allow us to get into my client's statement, the first statement, in which it does say that his wife was pushed.
>
> PROSECUTOR: Your honor, there's nothing—
>
> COURT: It's overruled. We will not open the evidence again.

The State then continued by arguing,

> There is nothing in that statement that he said—let's look at this. If that really happened and you are really defending your family, the first thing you are going to say is Officer, Officer Guajardo. You have got to understand. I did that but you have got to understand, he broke into my house and my wife was in danger and my kid was in danger so I had to stab him. Wouldn't that be the first thing that you would say? Instead what he says is I was drunk, the guy beat me up. Do you understand? I was hotheaded. I was mad. . . . I am going to ask you do not—and I really don't

7

believe any of you believe his statement. And if there is any question, just look at his original statement which is self-serving but completely inconsistent.

Again, appellant's counsel objected:

DEFENSE COUNSEL: The statement in evidence is not the original statement. I am asking the Court to open the evidence to get the original statement in under Rule—Article 3602 of the Code of Criminal Procedure, your Honor.

THE COURT: You offered it, sir. Y'all said it was the interview with the police.

DEFENSE COUNSEL: It was the second interview, your Honor. I am asking if the Court would open the evidence to get the first interview in. The prosecutor is leaving a wrong impression on this jury.

THE COURT: No, sir. Whatever it is, the evidence will not be reopened in this case. Please continue, sir.

Appellant perfected a bill of exception following argument and offered the transcript of the statement. The judge accepted the transcript for the purposes of the bill of exception, but it did not go to the jury.

## STANDARD OF REVIEW

A trial court shall allow testimony to be introduced at any time before the argument of a cause is concluded, "if it appears that it is necessary to a due administration of justice." Tex. Code Crim. Proc. Ann. art. 36.02 (West 2007). "Due administration of justice" means a judge should reopen the case if the evidence would materially change the case in the proponent's favor. *Peek v. State*, 106 S.W.3d 72, 79 (Tex. Crim. App. 2003). Under this interpretation, litigants are encouraged to introduce their evidence during the course of the trial rather than waiting until closing

arguments. *Id.*; *Allman v. State*, 164 S.W.3d 717, 719 (Tex. App.—Austin 2005, no pet.). This Court in *Allman* noted that the standard thereby prevents either party from seeking out additional evidence in order to counter the other party's argument. 164 S.W.3d at 719. The court in its sound discretion can admit evidence at any time before argument closes and such discretion will be reversed only when abused. *Perry v. State*, 464 S.W.2d 660, 662 (Tex. Crim. App.1971) (finding no abuse of discretion where trial court allowed State to reopen evidence after both parties had rested).

## DISCUSSION

Appellant points to two specific points he made in the first statement that he claims would have materially changed the case in his favor. The first was his statement that the decedent "pushed my wife." Later in the interview, appellant stated that "he [the decedent] is bothering my family." Appellant claims that his theories of self-defense and defense of a third person were undermined by the State's argument that during police interrogation (the *second* statement) he said nothing of an attack on his wife. Under the standard set forth in *Peek*, in order to show that the trial court abused its discretion, appellant must show that the evidence he sought to introduce would have materially changed the case in his favor. 106 S.W.3d at 79. Although we do not condone the trial court's statement that he would not reopen the evidence, "[w]hatever it is," we hold that the trial court could have reasonably concluded that the first statement would not have materially changed the case in appellant's favor had it been introduced.

Appellant gave the first statement to Detective Guajardo, the same detective who took the statement that was admitted at trial. From the context of the first statement, it appears that the

9

interrogation was conducted at the hospital. First, we examine appellant's statement to police officers that Delira had "pushed my wife." It is not clear from the context of the statement when appellant was claiming that Delira pushed his wife. In fact, in the same sentence, appellant makes reference to another time when Delira allegedly broke appellant's window. Nowhere else in the statement does appellant state that Delira had pushed his wife.

Second, we examine appellant's statement, "he [Delira] is bothering my family." The statement lacks specificity as to what Delira did to bother appellant's family or when it happened. After reading the statement in its entirety, it appears that there was bad blood between appellant and Delira. Appellant testified that he had called the police on Delira in the past because he thought that Delira had broken his window, which resulted in his son being cut by broken glass. No charges were brought against Delira, due to lack of evidence.

The first interview also yielded other statements that might or might not have been helpful to appellant. These statements included, "He hit me there and I reacted badly like an animal and I hit him . . . I don't know what happened," "I [inaudible] reacting . . . I don't know what happened . . . I lost my mind . . . I [inaudible] my mind and I don't know what I did to him," "I don't remember if I hit him [inaudible] I remember that I let it get to me [inaudible]," and "I don't remember I [inaudible] the blood to the head [inaudible] I lost my head and well I started to hit him."

Appellant also conceded in the first statement that his fight with Delira did not take place inside his own apartment. The following exchange was recorded in the transcript of appellant's first statement:

10

GUAJARDO: Ok, and where did all this happened [sic], when you got really angry with him?

APPELLANT: Because he hit me . . .

GUAJARDO: Ok, but, where did it happened [sic]?

APPELLANT: In my apartment.

GUAJARDO: In front of it?

APPELLANT: Yes.

We conclude that appellant's theories of self-defense and defense of others would likely not have been helped by the introduction of the first statement. The stated purpose of the standard set forth in *Peek* is to encourage litigants to introduce their evidence during the course of the trial rather than waiting until closing arguments. 106 S.W.3d at 79. Appellant testified in his own defense in this case. Officer Guajardo testified about the second statement. Appellant's counsel did not seek to introduce the first statement at any point in the trial other than when the State made its closing argument. While the first statement contains some information different from the second, it does not rise to the level of materially changing the case in appellant's favor. All witnesses except appellant testified that appellant pursued Delira into another apartment. Even under appellant's version of the events, the fatal stabbing did not take place in appellant's apartment. This greatly diminishes the impact of the first statement on appellant's defense-of-third-person theory. We cannot say that the trial judge abused his discretion by refusing to reopen the evidence.

We overrule appellant's point of error.

## CONCLUSION

Having overruled appellant's sole point of error, we affirm the judgment of conviction.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed: May 21, 2009

Do Not Publish

12